IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 16–cv–01162–KMT

NUTRITIONAL BIOMIMETICS, LLC,
  Plaintiff/Counterclaim Defendant and
    Counterclaim Plaintiff,

v.

EMPIRICAL LABS INCORPORATED,
  Defendant/Counterclaim Plaintiff,

v.

CHARLES BARKER
  Counterclaim Defendant,

and

EMEK BLAIR,
CLVM, LLC,
  Counterclaim Defendants/
  Counterclaim Plaintiffs,

v.

KELLY GOYEN and
ASA WALDSTEIN,
  Counterclaim Defendants.

---

# ORDER

---

This matter is before the court on Defendant/Counterclaim Plaintiff "Empirical Labs'

Motion for Partial Summary Judgment." (Doc. No. 94 ["Mot."]). Plaintiff/Counterclaim

Defendant/Counterclaim Plaintiff Nutritional Biomimetics, LLC ("NB") filed a Response (Doc.

No. 106 ["Resp."]), to which Defendant/Counterclaim Plaintiff Empirical Labs, Inc. ("Empirical Labs") replied. (Doc. No. 113 ["Reply"].)

## BACKGROUND INFORMATION

Empirical Labs produces and sells nutritional supplements. From 2010 through 2014, Empirical Labs employed Counterclaim Plaintiff/Counterclaim Defendant Dr. Emek Blair ("Dr. Blair"). In November 2012, Dr. Blair created NB and serves as the sole managing member. While Dr. Blair was employed by Empirical Labs, NB and Empirical Labs entered into multiple licensing agreements involving the development, manufacturing, and selling of liposomal nutritional products. Dr. Blair and NB contend that NB owns the manufacturing methodology and formulas related to the liposomal products and that Empirical Labs could only manufacture and sell products derived from the same pursuant to a licensing agreement from NB allowing it to do so. Under the licensing agreement in place during the time period relevant to the instant Motion, Empirical Labs was required to pay NB 15% of its gross profits from the sale of liposomal products covered by the agreement. Empirical Labs disputes NB's characterizations of the licensing agreements, contends they are neither valid nor enforceable, and contends the manufacturing methodology and formulas related to the liposomal products are Empirical Labs' trade secrets stolen and utilized by Dr. Blair and NB.

In order to resolve Empirical Labs' Motion for Partial Summary Judgment, it is not necessary for the court to determine the proper characterization of the licensing agreements and their validity, nor the proper owner of the liposomal manufacturing methodology and formulas. The issue presented in Empirical Labs' Motion is limited to the enforceability of a stipulated damages provision contained within a document entitled "Resolution of Phytalive product use of

2

structured phophotidycholine and liposomal iodide" ("Resolution"), executed by NB and Empirical Labs in June 2014, and related to liposomal products not previously covered by a licensing agreement. Empirical Labs seeks summary judgment from this court that the Resolution's stipulated damages provision is not enforceable because it serves as a penalty clause rather than a liquidated damages provision. Empirical Labs further contends that, if the court concludes the stipulated damages provision is unenforceable and the trier of fact ultimately determines Empirical Labs breached the Resolution, the proper measure of damages would be 15% of Empirical Labs' gross profits because that was the amount Empirical Labs was paying NB under the licensing agreement in place at the time the Resolution was executed.

**UNDISPUTED FACTS**

1. In June 2014, Empirical Labs and NB executed the Resolution, which provides, "Empirical Labs has manufactured two products that are under the liposomal agreement. . . . . Due to miscommunication, [Empirical Labs] will not be required to make any payments for these products as long as no further batches will be manufactured past June 25, 2014." (Doc. No. 94-1.)

2. The Resolution further provides:

In the future, [Empirical Labs] must get express signed written authorization via a licensing agreement from NB, LLC prior to manufacturing any new formulas that are liposomal products, advanced bioavailability products (aka UltaXorb), or any of the krill oil processing products as finished product, bulk, or as an ingredient(s) in another product(s).

(*Id.*)

3. The Resolution includes the following stipulated damages provision: "If [Empirical Labs] does not comply, it will be required to pay the full retail price of manufactured products to NB LLC, no less than $0.25 per 5mL." (*Id.*)

4. On May 29, 2014, prior to executing the Resolution, Dr. Blair submitted a draft to Mr. Goyen for his review. (Doc. No. 94-3 at 1-2.)

5. Upon reviewing the same, Mr. Goyen replied to Mr. Blair, "The licensing resolution seems a bit strong on penalty." (Doc. No. 94-3 at 1.)

6. Nevertheless, the Resolution was signed by Counterclaim Defendant Kelly Goyen ("Mr. Goyen"), President of Empirical Labs, on June 2, 2014 and Dr. Blair for NB on June 3, 2014. (*Id.*)

7. An addendum to the Resolution was subsequently proposed that partially extended the duration of the Resolution until July 30, 2014 and included the following language, "The penalties associated have previously been outlined in the previously signed 'Resolution.'" (Doc. No. 94-4.)[1]

8. During a hearing in this litigation, Dr. Blair testified as to the nature of the Resolution's liquidated damages provision. (Doc. No. 106-1 at 12-14.)

9. While under direct examination by his own counsel, Dr. Blair explained that the Resolution resulted from discovering that Empirical Labs had been producing certain products owned by NB without a license and therefore:

> I approached Mr. Goyen, I said, well, look, let's sign a licensing agreement for this. You know, it's a little late, but we --- let's just get it done now and, you

---

[1] The copy of this addendum relied upon by Empirical Labs has only been signed by Mr. Goyen and was never executed by Dr. Blair. (*Id.*)

know, keep on moving forward. He said, well, there's not enough margin in this
product for me to pay you and still make money.

. . . Let's just state on - - on paper that from now on, it absolutely has to be
written, signed, and countersigned. And that's the only way that Empirical Labs
can get a license.

And if - - then he said, okay. And I was like, there also has to be a penalty
associated. And what I said was, look, the penalty has to be pretty serious,
because - - or, you know, has to be - - has to make it - - be a true barrier, okay, to
doing this. It can't be like, well, I just pay you the percentages that we already
agreed on or something like that. It has to be something that would really prevent
Empirical Labs from making any product without Nutritional Biomimetics'
consent.

So we wrote in there - - or I wrote in there that if Empirical Labs - - and that's the
last line of the paragraph. And it says, if EL does not comply, it will be required
to pay the full retail price of manufactured process to NB, LLC no less than 25
cents per 5mL. And just so you understand, the structure of how Empirical Labs
works is they sell it at wholesale or distributor pricing. Okay? Which is
oftentimes anywhere from a quarter to - - to half to sometimes, even, you know, a
fifth of the full retail price. So this would be a true barrier for them not to make
the product without the express written permission from Nutritional Biomimetics.

Mr. Goyen tried to negotiate that point. You know, he sent me this contract
signed but with the last part crossed out, and he initialed it. I called him back or
emailed - - I communicated with him one way or another, and said, listen, this
contract has to have teeth. If it doesn't have teeth, what's the point of doing this?
And he eventually capitulated.

(*Id.* at 13-14.)

10. As of the date of the Resolution, Empirical Labs was paying NB 15% of profits on all products covered by their licensing agreements, which were set to expire on December 31, 2014. (Doc. No. 107-8.)

**STANDARD OF REVIEW**

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

5

56(a). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c). A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248).

When ruling on a motion for summary judgment, a court may consider only admissible evidence. *See Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1209–10 (10th Cir. 2010). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works*, 36 F.3d at 1517. Moreover, because Plaintiff is proceeding *pro se*, the court, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see also Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (holding allegations of a *pro se* complaint "to less stringent standards than formal pleadings drafted by lawyers"). At the summary judgment stage of litigation, a

plaintiff's version of the facts must find support in the record. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

## ANALYSIS

**1. Stipulated Damages Provision**

Empirical Labs seeks summary judgment that the Resolution's stipulated damages provision is an unenforceable penalty clause, rather than an enforceable liquidated damages provision. NB argues the stipulated damages provision merely allows for liquidated damages, was negotiated by the parties, and is fully enforceable.

Disapproval of penalty clauses is well-established, dating back to the common law. *Wasserman's, Inc. v. Township of Middleton*, 645 A.2d 100, 105-06 (N.J. 1994). In order to determine whether a stipulated damages provision constitutes a penalty, rather than liquidated damages, the court must consider:

> (1) whether the parties intended to liquidate damages; (2) whether the amount of liquidated damages, when viewed as of the time the contract was made, was a reasonable estimate of the *presumed actual damages* that the breach would cause; and (3) whether, when viewed again as of the date of the contract, it was difficult to ascertain the amount of actual damages that would result from a breach.

*Klinger v. Adams Cnty. Sch. Dist.*, 130 P.3d 1027, 1034 (Colo. 2006) (emphasis in original) (quoting *Rohauer v. Little*, 736 P.2d 403, 410 (Colo. 1987)). Additionally, "the party challenging the liquidated damages provision bears the burden of proving" it is unenforceable as a penalty. *Rohauer,* 736 P.2d at 410. "Unless the contract reveals on its face that the stipulated

7

payment is so disproportionate to any possible loss as to constitute a penalty, the determination of whether the specified damages constitute a penalty is a question of fact." *Bd. of Cnty. Comm'rs of Adams Cnty. v. City and Cnty. of Denver,* 40 P.3d 25, 29 (Colo. App. 2001) (citing *Yerton v. Bowden*, 762 P.2d 786 (Colo. App. 1988)); *see also Klinger,* 130 P.3d at 1034 (same).

Considering the first factor, the court notes that "[t]he terms used by the parties are not conclusive as to whether a contract provision was intended to be a liquidated damages clause. Rather, the determination depends upon the intention of the parties as it appears from the nature of the contract, the situation of the parties, and the attending circumstances." *Bd. of Cnty. Comm'rs of Adams Cnty.,* 40 P.3d at 30. Here, the stipulated damages provision is not defined in the Resolution as either a penalty or liquidated damages. However, both parties have explicitly stated they viewed the clause as a penalty.

During negotiation of the Resolution, Mr. Goyen initially took out the damages provision because it was "a bit too strong on penalty." (Doc. No. 106-1 at 14; Doc. No. 107-9) Even more significantly, during a previous hearing in this matter, Dr. Blair was adamant in his characterization of the provision as a penalty. (Doc. No. 106-1 at 12-14.) He specifically stated that he insisted on the inclusion of the stipulated damages provision because it was imperative the Resolution include a "penalty," the "contract has to have teeth," and "the penalty has to be pretty serious" in order to "be a true barrier" to prevent Empirical Labs from breaching. (*Id.* at 14.)

Additionally, the reasoning supporting the Resolution's stipulated damages amount indicates it does not satisfy the second factor, *i.e.*, whether the stipulated amount is a reasonable estimate of the presumed actual damages. *See Klinger*, 130 P.2d at 1034. The stipulated

8

damages provision requires Empirical Labs to pay NB the full retail price of the subject product. (Doc. No. 94-1; Doc. No. 106-1 at 14.) As Dr. Blair explained, Empirical Labs sells their products at wholesale or distributor price, which is "anywhere from a quarter - - to half to sometimes even [] a fifth of the full retail price." (Doc. No. 106-1 at 14.) Therefore, the amount listed would be two to five times more than Empirical Labs' gross profit on every transaction. Thus, Dr. Blair intentionally set this amount so it would be significantly higher than the price at which Empirical Labs sold the subject products and without any reduction for costs of goods sold, rather than in relation to any potential loss suffered by NB. (*Id.*) Dr. Blair stated the stipulated damages would, therefore, "be a true barrier for [Empirical Labs] to make the product without the express written permission from [NB]." (Doc. No. 106-1 at 14.) Not only does this reasoning illustrate the punitive, rather than compensatory, nature of this provision, it also illustrates the stipulated amount is not reasonably related to the actual damage suffered by NB for Empirical Lab's alleged breach of the Resolution. *See, cf., Peerless Enters., Inc. v. T.N.T., Inc.*, 511 P.2d 538, 539 (Colo. App. 1973) (holding a stipulated damages clause was unenforceable under the second factor because it allowed the injured party to recover as income the "gross profits" of the violating party "without incurring any of the expenses ordinarily required to produce income.")

Finally, NB contends this case is strikingly similar to *Mgmt. Recruiters of Boulder v. Miller*, 762 P.2d 763 (Colo. App. 1988), in which the Colorado Court of Appeals affirmed a trial court's ruling that a contract's stipulated damages provision was enforceable as providing for liquidated damages. *Id.* at 766. In *Mgmt. Recruiters*, the liquidated damages were equal to the fees earned by the breaching party, a former employee of the plaintiff that violated his covenant

9

not to compete. *Id.* The trial court determined, and the appellate court upheld, that the liquidated damages provision was designed to provide a reasonable estimate of the non-breaching party's damages. *Id.*

However, the stipulated damages provision at issue in *Mgmt. Recruiters* is distinguishable from the present case. As noted, upon a breach of the Resolution, Empirical Labs would not merely be required to pay an amount equal to what it earned on the sale of the subject products. (Doc. No. 94-1; Doc. No. 106-1 at 14.) Instead, it would inherently be required to pay NB significantly more than Empirical Labs earned, in some cases five times more than the normal wholesale price and without any reduction for the costs of manufacturing, packaging, marketing or other costs associated with generating net profit. (*Id.*) The basis for the damages calculation is not reasonably related to the actual damage suffered by NB for Empirical Lab's alleged breach. *See Klinger,* 130 P.3d at 1034.[2]

Based on the record and absent any material contested facts, the court finds there is no question of fact that the Resolution's stipulated damages provision constitutes a penalty clause and is, therefore, unenforceable under Colorado law.

**2. Proper Measure of Damages**

Empirical Labs argues in its Motion that if the Resolution's stipulated damages provision is found unenforceable, the proper measure of damages for a breach of the same is 15% of Empirical Labs' profits on its sales of the subject products. (Mot. at 10.) It bases its position on the licensing agreement in place at the time the Resolution was executed requiring Empirical

---

[2] A stipulated damages provision must meet all three factors set forth in *Klinger* in order to be enforceable. *Id.* at 1034. In light of the fact the court has determined the provision in this case does not meet the first two, it is unnecessary to address the final factor related to whether actual damages were difficult to ascertain at the time the contract was made. *Id.*

Labs to pay that amount to NB in exchange for NB allowing it to produce and sell the covered products. (*Id.*)

However, the final licensing agreement between the parties expired on December 31, 2014. (Doc. No. 107-8.) Plaintiff's position would essentially require the court to bind the parties to a licensing agreement that is no longer in effect. (Doc. No. 107-8.) Aside from this untenable result, the case law is clear that if a stipulated damages provision is held unenforceable, the proper measure of damages is the actual damage suffered by the non-breaching party. *See Oldis v. Grosse-Rhode*, 528 P.2d 944 (Colo. App. 1974) ("The fact that a liquidated damages provision is not enforceable does not [] preclude the party for whose benefit the clause was written from recovery of his actual damages for breach of the contract."). *See also Yerton*, 762 P.2d at 788 (noting that when a liquidated damages provision is held unenforceable, the non-breaching party may recover its actual damages). Thus, if the trier of fact ultimately concludes Empirical Labs breached the Resolution, NB may recover its actual damages. *See id.*

Accordingly, it is

**ORDERED** that "Empirical Labs' Motion for Partial Summary Judgment" (Doc. No. 94) is **GRANTED in part** and **DENIED in part**. The Motion is granted to the extent it requests summary judgment that the stipulated damages provision contained in the June 2014 Resolution is unenforceable as a penalty clause. The Motion is denied to the extent Empirical Labs seeks a ruling that the proper measure of damages for a breach of the June 2014 Resolution is equal to 15% of Empirical Labs' gross profits on liposomal products. Should the trier of fact ultimately

11

determine Empirical Labs breached the June 2014 Resolution, Nutritional Biomimetics may recover the actual damages it suffered as a result of said breach.

**Dated this 20th day of April, 2017.**

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge