IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 16–cv–01162–KMT

NUTRITIONAL BIOMIMETICS, LLC,
    Plaintiff/Counterclaim Defendant and
        Counterclaim Plaintiff,

v.

EMPIRICAL LABS INCORPORATED,
    Defendant/Counterclaim Plaintiff,

v.

CHARLES BARKER
    Counterclaim Defendant,

and

EMEK BLAIR,
CLVM, LLC,
    Counterclaim Defendants/
    Counterclaim Plaintiffs,

v.

KELLY GOYEN and
ASA WALDSTEIN,
    Counterclaim Defendants.

# ORDER

Empirical Labs produces and sells nutritional supplements. Counterclaim Defendant Charles Barker ("Barker") is primary owner of the company, MitoSynergy, which became a customer of Empirical Labs starting in 2012 purchasing liposomal products from Empirical Labs to use in its own products. Counterclaim Defendant Emek Blair ("Blair") was an employee of

Empirical Labs from 2010 through early 2015. Barker and Blair met through MitoSynergy's business relationship with Empirical Labs, and at some point Blair's wife became a MitoSynergy employee. Blair and Barker began to work together on side projects prior to Blair's termination from Empirical Labs, as well as starting talks about the formation of a new company and Blair's disassociation with Empirical Labs. In this lawsuit, Empirical Labs asserts civil conspiracy and fraudulent nondisclosure claims against Barker alleging Barker illegally participated in a conspiracy with various entities and individuals to assist Blair in starting and operating a competing business using Empirical Labs' pilfered customers, trade secrets and intellectual property.

This matter is before the court on Counterclaim Defendant "Charles Barker's Motion for Summary Judgment [Doc. No. 104]("Mot."). Defendant/Counterclaim Plaintiff Empirical Labs, Inc. ("Empirical Labs") filed a Response [Doc. No. 117]("Resp."), to which Counterclaim Defendant Barker replied. [Doc. No. 122]("Reply").

**UNDISPUTED FACTS**

1. Blair began working for Empirical Labs in January 2010 as the Director of R&D & Quality Assurance. His employment responsibilities included "developing a saleable liposomal glutathione product." (Empirical Labs's Second Amended Counterclaim [Doc. No. 81] (2d Am. CC"), Ex. 6, Blair's Profit Sharing Agreement signed 2/22/2010 [Doc. No. 81-6] ("2/22/10 P.S.Agree.") at 2.[1] Empirical Labs paid Blair a base salary of $1,000/week beginning in January 2010 and that salary was increased incrementally to $2,000/week by January 2015. The Blair

---

[1] The 2d Am. CC, Ex. 7, Blair's Profit Sharing Agreement signed 8/26/2010 [Doc. No. 81-7] ("8/26/10 P.S.Agree.") deletes this statement and states instead, "While Emek Blair is responsible for developing saleable liposomal products, Empirical Labs shall be solely responsibility [sic] for the safety and efficacy and [sic] any such product." *Id*. at 2.

2

and Empirical Labs' agreements also included provisions providing Blair with a percentage of profits related to certain products with a provision that Blair's profit sharing would be relinquished if he voluntarily left the employment with Empirical Labs within the first two years of his employment. (2/22/10 P.S.Agree and 8/26 P.S.Agree, generally.)

2. Both agreements provided that Blair was an employee of Empirical Labs and was not responsible for any actions or products released by Empirical Labs. (*Id*. at 2 on both agreements.) Further, both agreements also included a provision prohibiting the communication of Empirical Labs' trade secrets, as well as a non-compete agreement prohibiting Blair's competition with Empirical Labs "in the nutraceutical liposomal field for a period no less than 18 months." (2/22/10 P.S.Agree at 3). That agreement was modified to some extent in the second agreement, stating "Emek Blair may not work as a wet chemistry researcher in the nutraceutical liposomal field for a period no less than 18 months[;] i. Emek Blair may work in an R&D capacity in any other field including but not limited to competing nutraceutical companies[.]" (8/26/10 P.S.Agree at 4.)

3. Barker holds majority interest in and is the CEO of MitoSynergy, a nutritional supplement company that had a customer-supplier relationship with Empirical Labs beginning in approximately 2012. Empirical Labs manufactured liposomal products for MitoSynergy. (Redacted Deposition Testimony of Charles Barker [Doc. No. 116-1] at 3:23[2]; Excerpts of Deposition Testimony of Kelly Goyen [Doc. No. 104-3] at 1-2; Article by Elizabeth Maxim dated 2/26/14 regarding MitoSynergy ("Maxim Article") [Doc. No. 116] at 2.)

---

[2] Since the deposition transcripts are partial and each page contains four pages of testimony, the court adopts the convention of denoting the court filing page number, followed by a colon and the internal deposition transcript page(s).

4. Blair was one of the Empirical Labs employees who would answer any questions or inquiries from customer, MitoSynergy. (Excerpts of Deposition Testimony of Kelly Goyen [Doc. No. 104-2] at 2; [Doc. No. 104-3] at 1-4.)

5. Blair was never a paid employee of MitoSynergy. [Doc. No. 116-1 at 6:40.]

6. On September 25, 2013, Barker identified Blair to a third party as being in charge of GreenTeaSynergy and MitoMelt for Barker's company, MitoSynergy. (Email from Charles Barker to Kris Olsen with copy to emekblair@gmail.com dated September 25, 2013 [Doc. No. 116] at 7.)

7. In 2014, MitoSynergy hosted several events during the Natural Products Expo West. The company's press release referenced Barker as CEO, President, and co-founder, and included the following statement: "Also on the MitoSynergy team is Emek Blair, Ph.D., is [sic] a Biochemist and leading researcher in the development of the Cunermuspir complex, and wife Mallory Blair, Ph.D., also a leading researcher and author of an informational paper for the Cunermuspir complex, to be released at [a MitoSynergy hosted event]." (Maxim Article at 2.)

8. In November 2014, MitoSynergy placed an order with Empirical Labs. In fulfilling the order, Empirical Labs used white bottles instead of the black bottles previously used for MitoSynergy products. Barker let Empirical Labs know he was upset about the switch. [Doc. No. 116-1 at 4:26-28.]

9. By approximately October 2014, Barker, Blair, and other individuals were discussing building a company together which would be headed by Blair and which would directly compete with Empirical Labs. [Doc. No. 116-1 at 10-11.]

10. Barker had dinner with Blair and Blair's wife, who was an employee of Barker's MitoSynergy, and Blair told Barker that Empirical Labs was no longer paying Blair on his intellectual property rights as it had in the past and that Blair was unhappy with the situation. [Doc. No. 116-1 at 7:58-59, 9:87-88.] Barker told Blair that if he decided to start a business on his own Barker might be interested in pursuing that with him. (*Id*.)

11. In connection with this discussion, Blair told Barker that he owned the intellectual property rights to the liposomal products manufactured by Empirical Labs. [Doc. No. 116-1 at 11:105.]

12. By January 2015, Blair had created CLVM, LLC ("CLVM").[3] (Articles of Organization filed January 15, 2015 [Doc. 81-9] at 11.)

13. Blair provided Barker with two legal opinions, dated January 12, 2015 and January 22, 2015, from two different attorneys regarding Nutritional Biomimetics' alleged ownership of certain intellectual property. (January 22, 2015 letter from Erik G. Fischer[4] to Blair [Doc. No. 104-6] and January 12, 2015 letter from Kevin William Ward [Doc. No. 104-8].) Barker testified that he may have received the letters but he did not read them. [Doc. No. 116-1 at 9:86.]

14. On January 19, 2015, while still employed by and receiving salary from Empirical Labs, Blair sent Barker an email from his personal email account, stating that "having the license to manufacture methodology is worth a lot. The ready-made business from Empirical is over a million annual (licenses that we will not renew for Empirical) and there is about the same

---

[3] In other documents, CLVM has been referenced as Custom Liposomal Vitamin Manufacturer.
[4] Mr. Fischer represents Blair and Nutritional Biomimetic in this litigation.

amount of new business that I'm working on right now. I will not issue a license to Empirical for that either." [Doc. No. 116-1[5] at 12:109.]

15. Barker testified that he understood the reference to "ready made business" as Empirical Labs' current customers. [Doc. No. 116-1 at 12:111.]

16. On January 28, 2015, Empirical Labs terminated Blair's employment *via* delivery of a termination letter specifying his last day of employment would be February 11, 2015. [Doc. No. 81-27.] The letter advised Blair that he should not come to Empirical Labs' facility after January 28, 2015.

17. Other than employees, only current or potential clients are permitted to tour Empirical Labs' facility which is not open to the public. No visitor, client or otherwise, is permitted entrance into the liposome manufacturing area of the facility. (Goyen Deposition [Doc. No. 104-14] at 4; [Doc. No. 104-18] at 1.)

18. Empirical Labs requires visitors to sign in prior to entering the facility. (See Deposition Exhibit 22 to Charles Barker Deposition; Visitor's Log [Doc. No. 81-22].)

19. On February 11, 2015, Barker physically presented himself at Empirical Labs with Eric Van Handel ("Van Handel") and Sheila Porter ("Porter") requesting a tour of the facility. [Doc. No. 116-1 at 17:146-147.] Blair was not at the Empirical Labs' facility when Barker, Van Handel and Porter visited. [Doc. No. 104-14 at 5.]

20. Eric Van Handel is the son of Marge Van Handel. Eric and Marge Van Handel are executives in their family trucking business, V&S Midwest, based in Wisconsin. Sheila Porter

---

[5] Deposition Exhibit 14 read into the record during Barker's Deposition.

works for V&S as the Controller. (Contact List for V&S Midwest Carriers Corp. [Doc. No. 81-23] at 2-3.)

21. Marge Van Handel also owns 16% of MitoSynergy and is the CFO of that company. [Doc. No. 116-1 at 3:21-22.] Eric Van Handel is not and never has been an employee of MitoSynergy nor does he hold any ownership interest. [Doc. No. 116-1 at 18:149-150.]

22. Barker testified that Porter occasionally performed services for MitoSynergy, such as "doing the books," however she primarily worked for V&S Midwest as the Controller and her doing work for MitoSynergy was a "perk." [Doc. No. 81-23 at 3; Doc. No. 116-1 at 15:123-124.]

23. On Empirical Labs' Visitors Log, Van Handel signed in first and under the category, "Company," he wrote MitoSynergy. Porter signed in second and Barker signed in last, each indicating "MitoSynergy" under Company. (Visitor Log at 2.)

24. An employee of Empirical Labs provided a tour to all three visitors after they signed the Visitor's Log with MitoSynergy, a company purporting to be a current customer, listed as their affiliation. [Doc. No. 104-14 at 3-4.] Neither Barker, Van Handel nor Porter toured the liposomal room. (*Id*. at 4.)

25. Barker had never been to the Empirical Labs facility before. [Doc. No. 116-1 at 19:154.]

26. Either the same day of the tour or the day after the tour of Empirical Labs, Barker, Porter, and Van Handel met with Blair to discuss the creation and operation of a business competing with Empirical Labs. This was the first time Van Handel and Blair had met. [Doc. No. 116-1 at 19:156.]

27. During the meeting, Blair said "he wanted to do a liposomal business and he needed investment." [Doc. No. 116-1 at 20:157.]

28. On February 17, 2015, V&S Midwest transferred $20,000.00 to CLVM and on February 25, 2015 it transferred another $50,000.00 to CLVM. [Doc. No. 116-2.]

29. Original draft agreements between Barker, Van Handel and Blair, circulated by Sheila Porter, indicated that Barker was to receive an 8% interest in Blair's CLVM for $167,500.00. Barker was to borrow the investment funds from Eric Van Handel. (*See*, e.g., Porter email dated September 9, 2015 [Doc. No. 116] at 42 and unsigned Promissory Note to Eric Van Handel c/o V&S Midwest Carriers Corp from Charles Barker, at 45-52 and unsigned "Operating Agreement of Custom Liposomal Vitamin Manufacturer, LLC (CLVM)" at 19.)

30. Barker, Van Handel and Blair eventually executed a Promissory Note and Equity Option Agreement on December 15, 2015, providing that Barker and Van Handel would loan CLVM a total of $335.000.00[6] in exchange for 5% interest per annum "or, in the alternative, an option (the "Option") to purchase a combined sixteen percent (16%) equity interest in CLVM, LLC" with Barker and Van Handel each entitled to 8% of total shares in CLVM. [Doc. No. 81-25 at 64-66.]

---

[6] The Promissory Note and Equity Option Agreement dated December 15, 2015 is marked "Attorney's Eyes Only" which indicates to the court that the terms of the agreement are confidential and not shared beyond the parties' attorneys. However, the monetary terms were placed on the public record in Doc. No. 117, Empirical Labs' Response to the Motion for Summary Judgment. *Id*. at 5. Therefore, even though the actual monetary terms of the agreement are not germane or necessary to the court's consideration of the instant motion, the figures are obviously no longer considered confidential so will not be redacted from this Order.

31. The Promissory Note and Equity Option Agreement dated December 15, 2015, provides that "Eric Van Handel has tendered Three hundred thirty-five thousand dollars ($335,000.00) to CLVM, LLC, on behalf of both Lenders. . . ." (*Id.*)

32. Barker testified that he did not provide any of the money loaned to CLVM to either CLVM or to Blair. During his deposition, Barker swore that he has "not given Emek any money. I have no funding in this." [Doc. No. 116-1 at 8:68.] Further, Barker testified, "Eric lent Emek money. It turned into a loan instead of an investment. So I have not paid any money out of pocket, zero, not one red penny." (*Id.* at 17:145.)

33. On December 15, 2015, Sheila Porter sent an email to Marge Van Handel, Eric Van Handel and Charlie Barker (among others) recounting "personal loans and additional funds loaned to Mito/CLab." [Doc. No. 116 at 58.] The email indicated that Barker owed $167,500.00 as "CLVM investment" and indicated this was "(secured with CLab stock)." Further the email indicated, "Still to be paid -+ $5000 for legal defense related to CLVM." (*Id.*) The email also set forth totals for investment and loans related to Charles Barker and his companies with and without "CLVM." (*Id.*)

## STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & County of Denver*,

36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c).  A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248).

When ruling on a motion for summary judgment, a court may consider only admissible evidence.  *See Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1209–10 (10th Cir. 2010).  The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment.  *Concrete Works*, 36 F.3d at 1517.  At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record.  *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

## ANALYSIS

### 1. Fraud (Count IX)

In its Second Amended Counterclaim, Empirical Labs asserts a fraudulent nondisclosure claim against Barker. [Doc. No. 6-46 at 5; Doc. No. 81 at 42-45.] Empirical alleges that Barker gained entry into the Empirical Labs' closed facility for himself, Van Handel and Porter under false pretenses and thereby gained information used to help Blair open a business directly competing with Empirical Labs. There are two primary bases for Empirical Labs' claim. First, Empirical contends that during Barker's visit on February 11, 2015, he failed to disclose that Van Handel's desire to see Empirical Labs' facility was as a potential investor in Blair's competing business CLVM, not as an associate of MitoSynergy. [Doc. No. 81-22 at 2.] Had Empirical Labs known Van Handel's true business association and purpose, Empirical Labs contends it would not have admitted him within its facility. [Doc. No. 104-14 at 1-4; Doc. No. 104-18; Doc. No. 116-1 at 19.] Second, Empirical Labs alleges that on the day of his visit, Barker knew he was no longer going to order any further products from Empirical Labs and that Barker concealed the real reason for his visit. [Doc. No. 116-1 at 4, 17, 18.] Rather than intending to discuss mistakes in MitoSynergy's previous order, Empirical Labs maintains Barker visited Empirical Labs in order to gain confidential information, to wit: to show Van Handel and Porter the kind of physical facility Blair would need to get CLVM up and running and to convince Van Handel to invest and become a co-owner in CLVM. (*Id.*)

Under Colorado law,

> [t]he elements of a claim of intentional nondisclosure [] are: (1) the defendant concealed or failed to disclose a fact that he had a duty to disclose; (2) the fact was material; (3) the defendant concealed or failed to disclose the fact with the intent of creating a false impression of the actual facts in the mind of the plaintiff;

11

(4) the defendant concealed or failed to disclose the fact with the intent that the plaintiff take a course of action he might not have taken had he known the actual facts; (5) the plaintiff took such course of action relying on the assumption that the concealed or undisclosed fact did not exist or was different from what it actually was; (6) the plaintiff's reliance was justified; and (7) this reliance caused injuries, damages, or losses to the plaintiff.

*Dury v. Ireland, Stapleton, Pryor & Pascoe, P.C.*, No. 08–cv–01285–LTB–MEH, 2009 WL 2139856, at *4 (D. Colo. July 14, 2009) (citing Colo. Jury Instr., Civil 19:2 (4th ed.)); *see also Ackmann v. Merchs. Mortg. & Trust Corp.*, 645 P.2d 7, 13–15 & n.3 (Colo. 1982) (citing with approval CJI–Civ. 19:2 for the elements of nondisclosure, and noting "[t]he statement of the elements of fraud by concealment in the Colorado Jury Instructions is substantially similar to the articulation of those elements contained in our case law."). In his Motion, Barker challenges the first, second, and seventh elements.

With regard to the first element, Barker contends he was not under a duty to inform Empirical Labs that he did not intend to use their services in the future, nor did he have a duty to disclose Van Handel's true identity as a potential investor in CLVM and not as an employee or associate of MitoSynergy who was a current customer of Empirical Labs. (Mot. at 8-11; Reply at 15-16.) Colorado courts apply Restatement (Second) of Torts § 551 to determine whether one party has a duty to disclose information to another. *See Mallon Oil Co. v. Bowen/Edwards Assoc., Inc.*, 965 P.2d 105 (Colo. 1998) (applying Restatement (Second) of Torts § 551 (Am. Law Inst. 1977) to analyze first element of a fraudulent nondisclosure claim).[7] To establish this element, Empirical Labs relies upon the following portion of the Restatement:

---

[7] *Mallon* states that "one party to a business transaction has a duty to disclose facts basic to the transaction when objective circumstances create a reasonable expectation of disclosure of those facts." *Id.* at 111. Empirical Labs argues that in *Mallon*, the court noted that a party who trespasses onto another party's property has a duty to disclose material information he or she

12

> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
>
>> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Restatement (Second) of Torts § 551 (Am. Law Inst. 1977).

The court finds that pursuant to § 551(2)(e), and drawing all inferences from the undisputed facts in favor of non-movant Empirical Labs, Empirical Labs has established disputed facts relevant to whether Barker had a duty to disclose to Empirical Labs that he was not a current customer and that Van Handel was a potential investor in CLVM rather than a MitoSynergy employee. Barker signed in after Van Handel and thus, should have been aware Van Handel had indicated he was affiliated with MitoSynergy. [Doc. No. 81-22 at 2.] Additionally, Barker admits that on the date he toured the facility he was not going to order from Empirical Labs in the future and that he was pursuing a business opportunity with Blair which involved Blair taking existing customers, including Barker's and Marge VanHandel's MitoSynergy, away from Empirical Labs. (*See* Undisputed Fact 15.) Barker also knew at the time of the tour that Barker would need to acquire the funds necessary to pursue the business opportunity with Blair from Van Handel and that CLVM would need to establish its own facility to begin manufacturing. [Doc. No. 116-1 at 4, 17, 18.] In light of Empirical Labs' policy of only permitting current customers into its facility, Barker knew that Empirical Labs would only

---

learned by virtue of the trespass and that Barker's actions in touring its facility was akin to a trespass. (Resp. at 16.) *Mallon*, however, addressed nondisclosure of information learned by virtue of the trespass. In this case, the nondisclosure alleged is information which facilitated the act of trespassing, not information learned as a result of the trespass. *Mallon*, 965 P.2d at 110-12. Therefore, *Mallon* is not directly on point with this case.

allow them into the facility if it was under the mistaken assumption they were current customers. [Doc. No. 104-14 at 1-4; Doc. No. 104-18 at 1-2; Doc. No. 116-1 at 19.] Further, a reasonable inference can be drawn that Empirical Labs would not have allowed persons to enter its facility for the purpose of providing guidance or calculating expenses associated with establishing a competing business. Finally, since Van Handel and Porter were principals and/or officers of V&S – a company in no way affiliated or doing business with Empirical Labs – a reasonable inference could also be drawn that there was no legitimate business reason for them to be touring Empirical Labs facility.

Barker also challenges the second element of fraudulent nondisclosure arguing that MitoSynergy, Van Handel and Porter's true lack of status as current customers of Empirical Labs, and the fact that Barker, Van Handel and Porter's real interest was in creating and investing in a company in direct competition with Empirical Labs, even if true, were not material facts. (Mot. at 11-12.)

> Undisclosed facts are "material" if the consumer's decision might have been different had the truth been disclosed. . . . A plaintiff does not have the burden of proving that his or her decisions necessarily would have been different had the truth been disclosed. *Ackmann v. Merchs. Mortgage & Trust Corp.*, 645 P.2d 7, 14 (Colo. 1982). As stated in *Ackmann*, "[t]he test, therefore, of material inducement is not whether the plaintiff's action would, but whether it might, have been different if the misrepresentation had not been made." *Id.* (quoting William Williamson Kerr, *Kerr on Fraud and Mistake* 43–44 (4th ed.)).

*Briggs v. Am. Nat'l Prop. & Cas. Co.*, 209 P.3d 1181, 1186 (Colo. App. 2009). The record establishes, as noted *supra*, a genuine issue of fact as to whether Empirical Labs' decision to allow Van Handel, Porter and Barker to tour its facility might have been different had it known the three were not current customers, but rather potential investors in fired employee Blair's

competing business, CLVM. [Doc. No. 104-14 at 1-4; Doc. No. 104-18 at 1-2; Doc. No. 116-1 at 19.]

Finally, Barker argues Empirical Labs has not met the seventh element of Empirical Labs' fraudulent nondisclosure claim in that no damages arise as a result of the ill-gotten tour of Empirical Labs' facility. (Mot. at 12-13; Reply at 16-17.) The undisputed facts show Barker and Blair were contemplating opening a business which would compete with Empirical Labs at some point before Barker, Van Handel, and Porter showed up for the tour. (*See* Undisputed Facts 9, 10, 12, 13 and 19.) The factual record and reasonable inferences therefrom are viewed in the light most favorable to Empirical Labs at this summary judgment stage. A reasonable inference can be drawn that the tour of the Empirical Labs facility provided information about what a facility of this sort of business should look like, what equipment and space requirements were needed and how much it might reasonably cost to develop and equip a facility such as Empirical Labs. It is also reasonably inferred that information such as this would likely be required before an investor would commit hundreds of thousands of dollars to any venture.

It is undisputed Barker and Van Handel contributed $335,000.00 to CLVM and that this contribution was by far the largest contribution made by any person or entity to CLVM. (Undisputed Facts 28, 29, 30 and 33; Response, Ex. 4, CLVM's response to Goyen's Interrogatory No. 5.) Therefore, a reasonable inference can be drawn that a tour of Empirical Labs to show Van Handel the size and equipment necessary for a facility like what was being contemplated as an investment by Barker and Van Handel in CLVM may have been critical to Barker and Van Handel's decision to go forward with funding the competing company. As controller of V&S and the Van Handel business strategy, Porter's assessment of what it would

take to create a facility for CLVM was also important to the decision to move forward in the undertaking with Blair. Therefore there remains a disputed issue for trial about whether the tour of Empirical Labs played a significant role in Barker's and his funding partners' investment decision to lend $335,000.00 to Blair, without which Blair would have been unable to establish a company with a facility to actually compete with Empirical Labs. [Doc. No. 117-4 at 2-3.] The court finds this is sufficient to establish a genuine disputed issue as to whether Empirical Labs' reliance on Barker's nondisclosures resulted in damages.

## 2. Conspiracy (Count V)

Empirical Labs asserts a civil conspiracy claim against Barker alleging he conspired to "steal Empirical Labs' trade secrets and confidential information, and to use them to start and operate a directly competing business in Colorado . . . ." [Doc. No. 81 at 39.] To establish a claim for civil conspiracy, a plaintiff must show by a preponderance of the evidence that there exists: (1) an object to be accomplished; (2) an agreement by two or more persons on a course of action to accomplish that object; (3) in furtherance of that course of action, one or more unlawful acts which were performed to accomplish a lawful or unlawful goal, or one or more lawful acts which were performed to accomplish an unlawful goal; and (4) damages to the plaintiff as a proximate result. *Double Oak Constr. v. Cornerstone Dev. Int'l*, 97 P.3d 140, 146 (Colo. App. 2003). Barker's challenge to this claim is limited to the second and third elements, arguing the record does not support the finding of an agreement on his part to accomplish an unlawful goal. (Mot. at 13-16.)

Initially, Barker relies on the legal opinions Blair provided to him in January 2015 in which two attorneys expressed their opinions that Nutritional Biomimetics, rather than Empirical

16

Labs, owned the intellectual property rights related to liposomal manufacturing. (*Id.* at 13-14.) However, Barker specifically testified that he did not read either letter and did not rely on either opinion. [Doc. No. 116-1 at 9.] Barker cannot rely upon the content of letters he adamantly states he never read as evidence of personal knowledge, belief, or understanding.

The record establishes Barker was aware Blair intended to obtain Empirical Labs' clients as CLVM clients. [Doc. No. 116-1 at 12.] Further, after litigation ensued in this case and it was clear the ownership interests of the liposome manufacturing process was in dispute and that Empirical Labs claimed its client list was a trade secret, Barker and Van Handel nevertheless executed the final promissory note and option agreement, loaning $335,000.00 to CLVM in return for, *inter alia*, interest income, as well as for options to purchase ownership interests in CLVM. [Doc. No. 81-25 at 64-66; Doc. No. 116-1 at 7-8, 11, 13, 56-57.] Further the group tour of Empirical Labs and the almost immediate meeting with Blair by Barker, Van Handel and Porter, give rise to reasonable inferences that at least Blair, Barker, Van Handel and Porter were colluding with respect to Blair's development of a business which, at the very least, was blatantly going to try to steal Empirical Labs' customers. Accordingly, based on the record, the court finds there remain significant disputed issues, including credibility determinations regarding Barker's testimony, which bear on whether Barker participated in an agreement to accomplish an unlawful goal.

Accordingly, it is

**ORDERED** that Counterclaim Defendant "Charles Barker's Motion for Summary Judgment" [Doc. No. 104] is **DENIED**.

Dated this 27th day of June, 2017.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge